## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DAVE WINGATE,

      Plaintiff,

      v.

BARKMAN HONEY, LLC,

      Defendant.

Case No. 5:19-cv-04074-HLT-JPO

## MEMORANDUM AND ORDER

Plaintiff Dave Wingate has sued Defendant Barkman Honey alleging fraudulent misrepresentation and violation of the Illinois Consumer Fraud Act. The claims arise out of Plaintiff's purchase of a bottle of Defendant's "raw" honey, which Plaintiff contends did not meet that distinction. Defendant moves for summary judgment on both claims, arguing that Plaintiff has no evidence of deception or reliance. As discussed below, the Court finds that Plaintiff has not come forward with evidence demonstrating that the honey he purchased did not meet his definition of "raw." Accordingly, the Court grants Defendant's motion.

## I.     BACKGROUND[1]

Plaintiff bought a bottle of Naked Wild Great Lakes Honey in the fall of 2018 at a store near his home in Illinois. Plaintiff generally purchases raw honey because it typically hasn't been modified by the manufacturer and is "more pure to nature." In terms of the benefits of raw honey, Plaintiff believes it can be used for sore throats or coughs or as a substitute for processed sugars. A picture of a bottle of "Naked Wild Honey" was presented at Plaintiff's deposition, and the

---

[1]   For purposes of summary judgment, the Court discusses only the facts that are uncontroverted. The Court also notes that some of Plaintiff's additional facts are purportedly supported by evidence cited to but not always included in the exhibits. Where factual assertions are not properly supported, or would not be admissible, the Court does not consider them. *See* Fed. R. Civ. P. 56(e); D. Kan. Rule 56.1(b)(2), (d).

bottle's label says that it is "gently processed to retain natural pollen and enzymes." But Plaintiff cannot say whether the bottle pictured is the bottle of honey he bought.

After purchasing, Plaintiff later learned about 5-hydroxymethylfurfural ("HMF") from his attorney. HMF is an organic compound in honey. *See* Doc. 74 at 5. HMF levels in honey only increase over time, even at room temperature. When Plaintiff bought the honey, he did not have any understanding that "raw" honey had anything to do with HMF levels. But Plaintiff later testified that he believes that "raw" honey must have an HMF level of 40 or less at the time of purchase.[2]

After the conversation with his attorney about HMF in honey, which occurred a couple of months after Plaintiff bought the honey, Plaintiff gave his bottle of honey to his attorney. Plaintiff's attorney relies on Dr. James Gawenis to process honey samples. Dr. Gawenis's testing data is analyzed by a German company using protected methods to determine HMF levels. Dr. Gawenis does not know whether any of the samples tested came from the bottle Plaintiff purchased. Plaintiff does not personally know the HMF level of the honey he purchased.

Plaintiff's attorney has submitted a declaration stating that he sent Plaintiff's bottle of honey to Dr. Gawenis, and that "[o]ne of the tests made by Dr. Gawenis was to determine the level of HMF in the product." Doc. 75-7 at 2. According to Plaintiff's attorney, the test results "returned an HMF level of 147mg/kg which is over three times the limit for denaturing enzymes in raw honey." *Id.* Although Plaintiff has also submitted an "Analysis Report" from the German company, Doc. 75-8, that report has not been authenticated, nor does it clearly identify any particular results as being for Plaintiff's bottle of honey.

---

2   The amended complaint also states that the "generally understood definition of raw [is] an HMF value of 40 or less." *See* Doc. 53 at 10.

According to Defendant's corporate representative, heat can have an impact on enzymes in honey. Defendant pre-heats its honey at a temperature of 100 to 110 degrees for one to two days. The honey is then heated at 122 to 135 degrees for 12 to 24 hours. Honey can be stored in Defendant's warehouse for weeks or even years. But it is not clear whether this was the process Defendant used in 2018 for the honey that Plaintiff purchased.[3]

## II.     STANDARD

Summary judgment is appropriate if there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 (1986). To carry this burden, the nonmovant "may not rely merely on . . . its own pleadings." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (internal quotations and citations omitted). "Rather, it must come forward with facts supported by competent evidence." *Id.* In applying this standard, courts view the facts and any reasonable inferences in a light most favorable to the non-moving party. *Henderson v. Inter-Chem Coal Co.*, 41 F.3d 567, 569 (10th Cir. 1994). "An issue of material fact is genuine if a 'reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

---

[3] Plaintiff only refers generally to Defendant's practices, without stating when these practices were in effect. The testimony cited by Plaintiff does not include any information about whether the practices described are current practices or whether they were in place in 2018 when Plaintiff purchased his honey. Although Defendant has not disputed Plaintiff's additional facts on these points, it notes that the questions were directed at Defendant's current practices, not its practices in 2018. Doc. 84 at 11. Neither party has provided the Court with the portion of the deposition transcript that would clarify this issue.

### III.   ANALYSIS

In a prior order, the Court granted Defendant's motion to dismiss Plaintiff's claims for negligence, violation of the Kansas Consumer Protection Act, and fraudulent concealment. Doc. 37 at 1.[4] Plaintiff's claim for fraudulent misrepresentation survived. *Id.* at 11-13. Plaintiff later amended his complaint and added a claim under the Illinois Consumer Fraud Act ("ICFA"), 815 ILCS § 505/2. Doc. 53 at 15-18. Thus, Plaintiff's remaining claims are for fraudulent misrepresentation and a claim under the ICFA.

Fraudulent misrepresentation requires: "(1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 591 (Ill. 1996).[5] "To recover on a claim under the [ICFA], a plaintiff must plead and prove that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages." *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019).

Ultimately, Plaintiff's fraudulent-misrepresentation and ICFA claims both require a showing of reliance on a false statement or deceptive act. Defendant argues Plaintiff can show neither because Plaintiff limits his definition of "raw" honey to a certain HMF level, and he has no evidence of HMF level, and he did not learn about HMF levels until after his purchase and thus could not have relied on any representation regarding HMF at the time of purchase.

---

[4]   Plaintiff's claims against True Source Honey, LLC were also dismissed for lack of personal jurisdiction. Doc. 37 at 1.

[5]   Although neither party directly addresses which law applies, Plaintiff purchased his honey in Illinois, and both parties apply Illinois law to his fraudulent-misrepresentation claim. *See* Doc. 37 at 9 n.5.

As a preliminary matter, the Court notes that Defendant—again—takes an overly narrow view of Plaintiff's claim in this case. As the Court noted in its ruling on Defendant's motion to dismiss, "Plaintiff's definition of raw . . . focuses on the effect of heating on the physical properties consumers expect and seek in raw honey," and under that definition, "honey is 'raw' if those properties remain intact; honey is not 'raw' if those properties are altered, compromised, or destroyed." Doc. 37 at 12;[6] *see also* Doc. 75 at 10 (arguing that the deceptive act is selling honey as "gently processed to retain natural pollen and enzymes" when in fact the heating process used by Defendant "denatured the very enzymes that it was promoting on both its label and its website").

Accordingly, Plaintiff's definition of "raw" honey turns on the preservation of certain natural qualities of honey, including enzymes—not just on a particular HMF level.[7] Both Plaintiff's fraudulent-misrepresentation claim and ICFA claim require him to show that Defendant claimed its honey was "raw" in this way (meaning retaining natural enzymes), when in reality it was not (because the way it was processed denatured those enzymes). The evidence Plaintiff points to in support of this alleged misrepresentation is the honey's HMF value (as reflecting the state of the enzymes) and testimony about how Defendant heats and stores its honey. Doc. 75 at 11. But the Court finds that this evidence is insufficient to create a genuine issue of material fact regarding whether Defendant falsely represented its honey as "raw."

---

[6]   Although Plaintiff has amended his complaint since the Court ruled on the motion to dismiss, the only material change appears to be substituting the ICFA claim for the dismissed Kansas Consumer Protection Act Claim.

[7]   That Plaintiff defines "raw" honey based solely on HMF levels is the basis of Defendant's argument that Plaintiff cannot demonstrate reliance for either of his claims. This is because it is undisputed that Plaintiff did not learn about HMF until <u>after</u> he bought the honey. Therefore, he could not have understood "raw" honey to mean something about HMF levels at the time of purchase. But as discussed above, the Court disagrees that Plaintiff's claims are based solely on his perception of HMF levels. Accordingly, the Court focuses instead on whether Plaintiff can demonstrate a genuine issue of fact on whether there was a false statement or deceptive act.

A.      **HMF Levels**

Plaintiff first argues that his honey was tested and its HMF level was 147 mg/kg. *Id.* He contends this is "far above the level that raw honey has in the hive and far above the level the Codex recognizes as the level that preserves enzymes in raw honey." *Id.* Defendant argues that Plaintiff has no <u>admissible</u> evidence of his honey's HMF levels at all, and even if the test results were admissible, those results do not show evidence of HMF levels <u>at the time of purchase</u>. Doc. 74 at 10-11. The Court agrees.

On the first issue, the Court agrees with Defendant that Plaintiff has no set forth no <u>admissible</u> evidence of his honey's HMF level. Plaintiff has apparently only identified two witnesses in this case: himself and Dr. Gawenis. But Plaintiff does not personally know the HMF level of his honey. And Dr. Gawenis, who processed the honey samples, does not know if any of the samples he processed belonged to Plaintiff. Thus, there's no one to testify about the HMF level of Plaintiff's honey.

The only other evidence of the HMF level of Plaintiff's honey is unauthenticated test results from the German company that analyzed Dr. Gawenis's testing data and an affidavit by Plaintiff's attorney stating that Plaintiff's honey had an HMF level of 147 mg/kg. Doc. 75-8; Doc. 75-7 at 2. Neither of these is admissible evidence. The purported test results from the German company are unauthenticated and it is unclear who could testify about them; none of the results are clearly identified as being for Plaintiff's honey. Nor is it clear how Plaintiff's attorney would be qualified to testify about the results of scientific testing that he did not conduct, to say nothing of the hearsay issues implicated by merely repeating test results. *See Johnson v. Weld Cnty., Colo.*, 594 F.3d 1202, 1210 (10th Cir. 2010) (noting that, although "an affidavit at summary judgment can be 'converted' in form into live testimony at trial, the content or substance of the affidavit

must be otherwise admissible, and any hearsay contained in a summary judgment affidavit remains hearsay, beyond the bounds of the court's consideration"); *see also Bell v. City of Topeka, Kan.*, 496 F. Supp. 2d 1182, 1185 (D. Kan. 2007) ("The personal affidavit submitted by plaintiff's counsel is insufficient to provide authentication when plaintiff's counsel is not the author of these documents nor does he state that he has any personal knowledge of the facts contained within those documents."). Based on this, the Court concludes Plaintiff has not come forward with any <u>admissible</u> evidence of his honey's HMF level that would allow a factfinder to conclude that his honey was not "raw."

Defendant's second argument regarding HMF levels is that, even accepting the test results showing an HMF level of 147, those results came months after Plaintiff purchased the honey. Because it is undisputed that HMF levels go up over time, even at room temperature, Defendant argues that an HMF level from months after purchase does not indicate the quality of the honey at the time of purchase. The Court agrees. Given that it is undisputed that HMF levels naturally increase over time, even at room temperature, test results from months after purchase simply are not material to the quality of the honey at the time of purchase or how it was processed before it was purchased. In other words, no reasonable jury could rely on HMF levels from months after purchase as evidence that honey was not "raw" when it was sold.

The Court further questions whether Plaintiff has presented sufficient evidence to allow a factfinder to draw any inferences <u>at all</u> about HMF levels or what it means about enzymes in honey. To support his claims about HMF levels, Plaintiff relies primarily on a document called the Codex Alimentarius ("Codex") and claims this document sets an international standard for a maximum HMF level of 40. Doc. 75 at 8-9. Only a portion of this Codex has been attached as an exhibit, and Plaintiff makes no attempt to authenticate it or explain what it is, other than citing to his

7

complaint—which is not evidence—to claim that it is recognized by the World Trade Organization as a "an international reference standard for the resolution of disputes concerning food safety and consumer protection." *See id.* at 8. Although Plaintiff acknowledges that the United States has not adopted the standards for honey set forth in the Codex, he states <u>without support</u> that "they are the standards followed by the honey industry." *Id.* at 9. Beyond that, Plaintiff fails to cite any pages in the Codex that reference acceptable HMF levels. *See* Fed. R. Civ. P. 56(c)(1)(a) (requiring parties to "cit[e] to particular parts of materials in the record"). Although the Court, on its own, was able to find a portion of the Codex that refers to HMF levels, *see* Doc. 75-5 at 6 (stating that the HMF level "after processing and/or blending shall not be more than 40 mg/kg" or 80 mg/kg for honey originating in tropical regions), that same page also notes that "[t]his text is intended for voluntary application by commercial partners and not for application by governments," *id. See also* Fed. R. Civ. P. 56(c)(3) (noting that a "court need consider only the cited materials, but it may consider other materials in the record"). The only other evidence explaining HMF levels is a memo written by Dr. Gawenis, which quotes a textbook passage about HMF levels—hearsay within hearsay.

Based on these facts, the Court finds that Plaintiff has not demonstrated through HMF levels that the honey sold by Defendant was not "raw."

### B.      Defendant's Heating Process

Plaintiff also suggests that Defendant's heating and storage procedures are evidence that its honey was not, in fact, "raw." The evidence Plaintiff points to is the way in which Defendant heats its honey during processing, and the fact that it stores and transports honey without temperature regulation and does not instruct retailers or consumers that its product be stored at a

cool temperature. Doc. 75 at 11.[8] But as Defendant points out, this evidence is immaterial because Plaintiff has not shown that the heating process he complains of was the process used for the honey he purchased. Defendant contends that the testimony at issue was regarding Defendant's <u>current</u> process, not the process used for the honey Plaintiff purchased. Plaintiff has not provided any evidence to refute this.

Beyond that, even accepting this testimony about Defendant's heating process, this does not create a genuine issue of material fact on whether the honey at issue was deceptively labeled as "raw." First, even if the honey Plaintiff had bought had been heated using this process, Plaintiff still has no evidence that the heating process damaged the enzymes in his honey to such an extent it was no longer "raw." At most, he would have evidence that the honey he bought had been heated at some point.[9] This does not, in and of itself, demonstrate that its enzymes had been so denatured that the honey could no longer honestly be called "raw."

Second, Plaintiff has not presented sufficient admissible evidence that processing honey at any particular temperature destroys enzymes to such an extent that the honey can no longer be considered "raw." As Defendant points out, Plaintiff's "claims about the relationships among enzymes, heat, and HMF are simply unsupported" and Plaintiff "does not even have an expert witness to speak to these issues." Doc. 84 at 18. Although Plaintiff relies on Dr. Gawenis's testimony and his memo,[10] the portion of Dr. Gawenis's deposition included in the record does not

---

8   Defendant's representative actually testified that he did not know what storage instructions were on the honey. Doc. 75-4 at 14-15.

9   Plaintiff acknowledges that the honey he purchased was labeled as having been "gently processed." Doc. 75 at 10. Plaintiff offers no argument about how Defendant's heating process crosses the line from "gently processed" to something else. Related to this, to the extent Plaintiff contends that he understood "raw" to mean honey that has not been modified or processed by the manufacturer at all, *see id.* at 3, he never explains how he could have had that expectation when the bottle he purchased clearly stated the contrary.

10  Plaintiff also alleged in his facts that Defendant's corporate representative "acknowledged that there is a relationship of HMF to heat and of enzymes to heat in honey" and that when "the HMF value in honey is increased by heating, the enzymes in that honey decrease." Doc. 75 at 7. But the portion of the deposition transcript cited

address the impact of heating to a particular temperature, and the memo is, as noted above, hearsay within hearsay. Further, the relationship between enzymes in honey and heating to a certain temperature would require expert testimony, and Dr. Gawenis has apparently only been designated as a fact witness.

Accordingly, the Court finds that Defendant's alleged heating process does not create a genuine issue of material fact on the issue of whether Defendant misrepresented its honey as "raw."

## IV.    CONCLUSION

Because Plaintiff has not created a genuine issue of material fact regarding whether Defendant made a false representation or committed a deceptive act, both his fraudulent-misrepresentation and ICFA claims fail and Defendant is entitled to summary judgment.[11]

THE COURT THEREFORE ORDERS that Defendant's Motion for Summary Judgment (Doc. 73) is GRANTED. Judgment is to be entered in favor of Defendant.

THE COURT FURTHER ORDERS that Plaintiff's Motion to Certify Class (Doc. 82) is DENIED AS MOOT.

IT IS SO ORDERED.

Dated: January 6, 2021                    /s/ *Holly L. Teeter*
                                          HOLLY L. TEETER
                                          UNITED STATES DISTRICT JUDGE

---

was not included in the record. The portion of the transcript provided does show that Defendant's representative acknowledged that heat does impact enzymes in honey. Doc. 75-4 at 4. But he did not say how or to what extent.

[11]  Defendant argues in its motion that Plaintiff's ICFA claim alternatively fails because Plaintiff lacks evidence that a reasonable consumer would be misled by the designation of "raw" honey. Doc. 74 at 11-13. Because the Court finds that both Plaintiff's fraudulent-misrepresentation claim and ICFA claim fail for want of evidence of a false statement or deceptive act, the Court does not reach this argument.